# No. 26-1595

# In the United States Court of Appeals for the Third Circuit

*IN RE CROSS-HOLDER AD HOC GROUP AND EXCLUDED FIRST LIEN LENDERS (each on behalf of its participating clients),*

*Petitioners,*

**On Petition for a Writ of Mandamus
to the Bankruptcy Court for the District of New Jersey
in No. 26-10910-MBK, Hon. Michael B. Kaplan**

### *AMICUS CURIAE* BRIEF OF
### PROFESSOR ADAM J. LEVITIN
### IN SUPPORT OF PETITIONERS

*ADAM J. LEVITIN
 Counsel of Record
600 New Jersey Ave., NW
Washington, DC 20001
AJL53@georgetown.edu*

# TABLE OF CONTENTS

*Page(s)*

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................1

SUMMARY OF ARGUMENT .................................................................2

I.   Forum Shopping Is Common in Large Case Chapter 11 Practice .....3

   A.  The Venue Statute Gives Debtors a Substantial, but Not
      Unfettered, Choice of Venue ..........................................................5

   B.  Forum Shopping Can Include Judge Shopping ............................10

II.  Forum Shopping Harms the Entire Chapter 11 Bankruptcy System
     11

   A.  Forum Shopping Undermines Confidence in the Neutrality of the
      Tribunal ......................................................................................11

   B.  Forum Shopping Reduces Access to Justice .................................13

   C.  Forum Shopping Can Be Outcome Determinative .......................13

III. The Bankruptcy Court's Decision Provides the Game Plan for
      Future Forum Shopping .................................................................14

IV. Irregularity of Bankruptcy Case Assignments in the District of New
      Jersey.............................................................................................15

   A.  New Jersey Bankruptcy Local Rules on Case Assignment ...........16

   B.  The Disparity in Case Assignments in Large Chapter 11s Among
      New Jersey Bankruptcy Judges ....................................................17

V.  Mandamus Should Be Granted More Freely in Bankruptcy Cases
     Because of Unique Obstacles to Bankruptcy Appeals ......................20

CONCLUSION .................................................................................22

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ...................................................................23

CERTIFICATE OF SERVICE ................................................................24

CERTIFICATE OF ADMISSION ...........................................................24

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

Bankr. Ct. Opinion, No. 26-10910 (MBK) (Dkt. 458), Mar. 16, 2025 ..... 14

*In re Abbott Lab'ys*, 96 F.4th 371 (3d Cir. 2024) ......................................20

*In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) ...........................22

**Statutes**

11 U.S.C. § 363(m) ...............................................................................21

11 U.S.C. § 364(e) ................................................................................21

28 U.S.C. § 1408 ............................................................................ 2, 6, 7

28 U.S.C. § 158(a) ...............................................................................21

N.J. Bankr. Local Rule 1002-1 .............................................................16

**Other Authorities**

Adam J. Levitin, *Judge Shopping in Chapter 11 Bankruptcy*, 2023 ILL. L. REV. 351 ..................................................................1, 12, 13, 14

Adam J. Levitin, Purdue*'s Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079 (2022)............................21

Adam J. Levitin, Purdue*'s Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079, 1123-25 (2022)...............1

Adam J. Levitin, *Rite Aid Pulls a Purdue Pharma to (Sorta) Pick Its Judge*, CREDITSLIPS.ORG, Oct. 16, 2023................................................1

James Nani, *Judge Kaplan on NJ Bankruptcy Court Getting Its Due: Q&A*, BLOOMBERGLAW, Aug. 21, 2023 ..................................................19

LYNN M. LOPUCKI, *COURTING FAILURE: HOW COMPETITION FOR BIG CASES IS CORRUPTING THE BANKRUPTCY COURTS* (2005) ...........................10, 12

Robert Lawless, *Bankruptcy Venue Shopping Breaks Perceptions of Judicial Fairness*, BLOOMBERGLAW, June 26, 2024.............................11

## INTEREST OF *AMICUS CURIAE*[1]

Adam J. Levitin is the Carmack Waterhouse Professor of Law and Finance at Georgetown University Law Center. His scholarship has previously addressed forum shopping and judge shopping in chapter 11 cases. Adam J. Levitin, *Judge Shopping in Chapter 11 Bankruptcy*, 2023 ILL. L. REV. 351; Adam J. Levitin, Purdue*'s Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079, 1123-25 (2022). He has also written specifically about forum bankruptcy shopping and judicial case assignment in the District of New Jersey. Adam J. Levitin, *Rite Aid Pulls a Purdue Pharma to (Sorta) Pick Its Judge*, CREDITSLIPS.ORG, Oct. 16, 2023, *at* https://tinyurl.com/5cb7uw7e.

Professor Levitin is concerned about the deleterious effects of forum shopping on the administration of justice in chapter 11 cases. He submits this brief to help the Court understand the policy problems that arise from forum shopping in chapter 11 cases.

---

[1] No one other than *amicus* has authored this brief in whole or in part nor made a monetary contribution intended to fund the brief's preparation and submission.

## SUMMARY OF ARGUMENT

The ability of debtors to shop into preferred venues—and in some cases to even select the judge—has a corrosive effect on chapter 11 practice. Forum shopping undermines parties' faith in the neutrality of the tribunal, changes litigants' behavior, and can determine case outcomes. It upsets the Bankruptcy Code's carefully calibrated balance of debtor and creditor rights, tilting the playing field to favor the debtor and its allies.

Debtors' ability to forum shop derives from the flexibility offered by the bankruptcy venue statute, 28 U.S.C. § 1408, but that flexibility is not without limits. Policy concerns about the impact of forum shopping militate toward a reading of the venue statute that rejects manufactured venue, such as exists in this case. If the Court denies the petition for mandamus, it will effectively greenlight the flagrant concoction of venue in chapter 11 cases.

This brief also highlights an issue petitioners are too polite to mention, but which colors consideration of forum shopping in the District of New Jersey, namely the statistical disparity in judicial assignment of large

chapter 11 cases, half of which have, since 2018, been assigned to a single judge—the very judge whose opinion triggered the mandamus petition.

Finally, this brief explains why a mandamus petition offers the only chance to address a harm capable of repetition, yet evading review. Mandamus is an extraordinary remedy, but the unusual obstacles that exist for bankruptcy appeals counsel for granting mandamus more freely in bankruptcy cases because mandamus petitions are often the only chance for any sort of appellate review of bankruptcy court decisions.

## ARGUMENT

### I. Forum Shopping Is Common in Large Case Chapter 11 Practice

Most large chapter 11 filings—that is cases with at least $1 billion million in scheduled liabilities for all affiliated debtors—are made in just a handful of judicial districts. As Figure 1 shows, of the 920 large case filings from 2018 to present reflected in the commercial data set maintained by BankruptcyData.com,[2] 40% were made in Delaware, 22% in the Southern District of Texas, 10% in the Southern District of New

---

[2] I use 2018 as the start date because that is the earliest date of complete coverage in the data set.

York, 4% in the Northern District of Texas, and 3% in the District of New Jersey. The other 89 federal judicial districts together have only 20% of the large cases.

**Figure 1. Venue of Chapter 11 Cases with Over $100 Million of Liabilities, 2018-present[3]**



The picture is starker for the largest bankruptcy cases ("**mega cases**"), those with over $1 billion in scheduled liabilities for all affiliated debtors. For mega cases, as Figure 2 shows, 43% have been filed in the Southern District of Texas, 29% in Delaware, 17% in the Southern

---

[3] Source: BankruptcyData.com.

4

District of New York, 6% in New Jersey, and a 5% for all other 90 judicial districts.

**Figure 2. Venue of Chapter 11 Cases with Over $1 Billion of Liabilities, 2018-present[4]**



The concentration of large and mega cases in a handful of judicial districts indicates rampant forum shopping in chapter 11.

### A. The Venue Statute Gives Debtors a Substantial, but Not Unfettered, Choice of Venue

Forum shopping is common in large chapter 11 cases because the bankruptcy venue statute gives debtors substantial leeway in where they

---

[4] Source: BankruptcyData.com.

may file. Debtors use this flexibility strategically to file their cases in venues they believe will advantage them in some way.

The venue statute provides that a debtor may file its case in the judicial district:

> in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district.

28 U.S.C. § 1408(1). The 180-day test in the venue statute protects against abuse of venue. Without it, a debtor could reincorporate and immediately achieve bankruptcy venue in the preferred district despite no pre-existing connection.

In addition to the venue possibilities offered by section 1408(1), a debtor may file in a district in which there is already a bankruptcy case pending concerning its corporate affiliate. 28 U.S.C. § 1408(2). Section 1408(2) enables debtors to "bootstrap" corporate entities that would not themselves qualify for venue in a district under section 1408(1) into an appropriate district based on having a single affiliate qualifying for venue under 1408(1).

6

Bootstrapping requires an underlying venue "hook": at least one affiliate must qualify for venue under section 1408(1) in order for its affiliates to utilize section 1408(2).

For Delaware venue, the 1408(1) hook is commonly achieved through "domicile," a term understood to mean state of incorporation. Delaware is a preferred jurisdiction for incorporation. As a result, many firms have at least one Delaware entity within their corporate family, so they can readily achieve Delaware venue for the entire firm by bootstrapping non-Delaware entities' filings through a pending case filed by a Delaware affiliate.

New Jersey incorporation is less common than Delaware incorporation. Thus, bootstrapping into New Jersey venue typically requires a different venue hook than domicile, such as the location of the debtor's principal assets.

Here, Multi-Color Corporation sought to achieve a "principal assets" venue hook for its corporate family. Multi-Color Corporation caused its subsidiary, MCC-Norwood, LLC, (the "**Debtor**") to arrange to have what it claims to be its "principal assets" in the District of New Jersey. Specifically, on December 19, 2025, the Debtor, a non-operating entity,

7

opened a bank account at ConnectOne Bank, in Englewood Cliffs, New Jersey. Bankr. Ct. Opinion, No. 26-10910 (MBK) (Dkt. 458), Mar. 16, 2025, at 2 ("**Bankr. Ct. Op.**"). The account was funded by the parent corporation on January 13, 2026. *Id.* That same day the Debtor opened and the parent funded a second bank account at the same bank. *Id.* The Debtor filed for bankruptcy sixteen days later, on January 29, 2026. *Id.*

The Debtor claims that the bank accounts constituted its principal assets at the time of filing and that venue was appropriate because the accounts were located in New Jersey for a greater part of the 180 days pre-petition than they were located elsewhere. The Bankruptcy Court interpreted "the district in which the…principal assets …[of the debtor] have been located" to refer to the district in which the principal assets *as of the moment of filing* had been located in the 180-day prepetition period, rather than referring to the location of whatever had been the principal assets of the debtor throughout the 180-day period prepetition. *Id.* at 11.

Thus, this case is about the "principal assets" hook used for bootstrapping, specifically about whether "principal assets" should be interpreted in a manner that allows them to be tactically generated on the eve of bankruptcy specifically for creating a venue hook. If throughout

8

the 180 days prepetition the Debtor's principal assets were actually in New Jersey, there would be no issue here. Instead, this case is about manufacturing venue, which the Bankruptcy Court blessed by interpreting the term "principal assets" to mean only those assets that exist at the time of filing whose location it traced back through the 180-day prepetition period. This reading undercuts the venue statute's anti-manipulation provision. The venue statute does not bless sham maneuvers to create a venue hook: the 180-day test in the venue statute exists to prevent debtors from manufacturing venue on the eve of bankruptcy.

It is important to recognize that nothing in this case affects the domicile hook used to achieve for Delaware venue or the propriety of bootstrapping. Put another way, this Court is not being asked to stop all forum shopping in bankruptcy—that is not possible under the current venue statute. Rather, this Court is being asked to correct an erroneous judicial interpretation of the venue statue that enables a flagrant forum shopping method that goes beyond what the venue statute permits. As discussed below, sound policy reasons counsel for limiting forum shopping when possible, such that the venue statute is not abused. If the

9

Bankruptcy Court is permitted to retain the Debtor's case based on nakedly manufactured venue, there will be no principled way to limit other debtors from manufacturing venue by having a subsidiary open a bank account in the desired district.

**B. Forum Shopping Can Include Judge Shopping**

Although forum shopping has long been a feature of chapter 11 practice,[5] for many years it was primarily district-level forum-shopping. In recent years, however, a phenomenon of judge-shopping has emerged as debtors have learned to use local rules regarding case assignment, deliberate creation of conflicts, and features of the ECF system to hand-pick the particular judge for their case.

Judge-shopping is particularly feasible in districts with very few judges, in districts where cases are assigned based on courthouse location, and districts with complex case panels consisting of a subset of the district's judges. As discussed below, there are indications that the situation in the District of New Jersey may involve not just forum

---

[5] *See* LYNN M. LOPUCKI, *COURTING FAILURE: HOW COMPETITION FOR BIG CASES IS CORRUPTING THE BANKRUPTCY COURTS* (2005) (detailing forum shopping and inter-district competition for big bankruptcy cases).

shopping, but also judge-shopping, which raises even sharper policy concerns than district-level forum shopping.

## II.   Forum Shopping Harms the Entire Chapter 11 Bankruptcy System

Forum shopping harms the integrity of the chapter 11 system. It undermines confidence in the neutrality of the tribunal, reduces access to justice, and can even affect case outcomes, producing an unlevel playing field.

### A. Forum Shopping Undermines Confidence in the Neutrality of the Tribunal

Forum shopping undermines parties' confidence in the neutrality of the bankruptcy court.[6] The mere fact that a debtor wants to be in a particular district suggests that the debtor believes that it is gaining an advantage through the choice of the forum.

The situation is even worse when the debtor can pick the judge. The scholarly literature has for some time identified a phenomenon of a small number of judges who appear to be actively courting large bankruptcy

---

[6] *See, e.g.*, Robert Lawless, *Bankruptcy Venue Shopping Breaks Perceptions of Judicial Fairness*, BLOOMBERGLAW, June 26, 2024.

case filings in their district.[7] When one party can pick its judge, the *perceived* neutrality of the entire system becomes suspect. As I have previously written:

> Even if there is no actual impropriety, forum shopping creates an innuendo of impropriety. Even if the judge has no interest in attracting big cases, the fact that a debtor has selected the judge to preside over its case creates an inference that the debtor believes that the judge is biased in its favor….The taint of judge shopping is an indelible original sin that colors every decision the judge makes in the case. Instead of parties being able to have confidence that the judge made a decision in good faith, when a case is judge shopped, parties are left wondering if the judge ruled a certain way because the judge was selected by the debtor due to actual bias. Judge shopping is thus damaging to parties' confidence in the integrity of the chapter 11 system; they cannot be sure they have received a fair adjudication before a neutral tribunal.[8]

The mere perception of judicial bias affects creditor behavior. If creditors believe the judge is biased against them, they will be more willing to settle disputes with the debtor for a lower price, rather than risk going before the judge for a ruling.[9] They also might not "bother making certain motions and objections, because they will weigh the certain cost of the motion or objection against what they gauge as the

---

[7] *See, e.g.*, LOPUCKI, *supra* note 5; Adam J. Levitin, *Judge Shopping in Chapter 11 Bankruptcy*, 2023 ILL. L. REV. 351.

[8] *Id.* at 382.

[9] *Id.*

remote chance of success" due to judicial bias.[10] Forum shopping undermines the assumption of a neutral tribunal that is critical to the adversary system.

## B. Forum Shopping Reduces Access to Justice

Forum shopping can also reduce access to justice. If a bankruptcy case is heard in a jurisdiction that is remote from where the debtor actually conducts business, it will be harder for certain creditors to participate in the case. In particular, tort victims and small claimants, such as vendors, may find the costs of traveling to attend court hearings to be onerous, especially in relation to the size of their claims.

## C. Forum Shopping Can Be Outcome Determinative

Forum shopping can be outcome determinative. Forum shopping allows debtors to choose the applicable circuit level law, and debtors are likely to file in circuits with favorable caselaw.

Judge shopping can supercharge the outcome correlation. For example, I have previously documented how superspeed "drive-thru" chapter 11 bankruptcy plans—some of which have been approved in under 24 hours, in contravention of clear statutory timelines—have been

---

[10] *Id.* at 382-83.

approved almost exclusively by just three judges, who also had been landing the lion's share of large public company bankruptcy cases.[11] When a party can pick its judge, it gains an unfair advantage in litigation.

## III.   The Bankruptcy Court's Decision Provides the Game Plan for Future Forum Shopping

The Bankruptcy Court stated that it could "conceive how some parties might develop creative workarounds to the protections built into the [venue] statute," but did not find this a particularly concerning problem. Bankr. Ct. Op., at 10. Instead, the Bankruptcy Court wrote about the "creative workarounds" as if they were a far-fetched hypothetical situation.

As discussed above, the forum shopping problem in chapter 11 is hardly hypothetical, but is instead a hallmark of large case practice. Indeed, the Bankruptcy Court needed to look no further than this very case to see exactly how debtors can and do "develop creative workarounds."

---

[11] *Id.* at 388-412.

The Debtor's actions in this case present the game plan for any other debtor that wishes to shop its way into New Jersey bankruptcy court: have an inactive, assetless subsidiary open a bank account in New Jersey two weeks before filing, get the court to approve various first day motions before venue is challenged, including a financing agreement with "suicide pact" terms that provide that failure to meet certain case "milestones" is an event of default, and then claim that a venue transfer would be too disruptive and costly because it would result in a milestone being missed.

If this Court does not grant the mandamus petition, it will, for all practical purposes, be giving a green light to unfettered forum shopping into New Jersey. If this is not a case of improper venue, what is?

## IV. Irregularity of Bankruptcy Case Assignments in the District of New Jersey

The mandamus petition is about whether this case should be in the District of New Jersey at all. But there is also a puzzling irregularity about the judicial assignment of the case *within* the District of New Jersey that feeds concerns about judge shopping. This context is important for this Court when evaluating the mandamus petition.

15

**A. New Jersey Bankruptcy Local Rules on Case Assignment**

The Local Rules for the Bankruptcy Court for the District of New Jersey provide for case assignment among the nine bankruptcy judges sitting in New Jersey. New Jersey Bankruptcy Local Rule 1002-1 provides that "A petition commencing a case must be filed in the vicinage in which the debtor is domiciled or in which the debtor maintains its residence, principal place of business, or principal assets." Local Rule 1002-1 further provides that the court is divided into three multi-county units known as "vicinages," based on the location of the three federal court houses in New Jersey: Newark, Trenton, and Camden. The unstated implication is that cases will be randomly assigned to judges within each vicinage, subject to conflicts.

The Newark vicinage is defined to include Bergen County, New Jersey, which is where the Borough of Englewood Cliffs is located. Local Rule 1002-1. Englewood Cliffs is the location of the bank branch at which the Debtor maintained what it purports to be its principal assets. The Debtor has no relationship with any other location in New Jersey. The Debtor's filing should, therefore, have been in the Newark vicinage, so its case should have been randomly assigned to one of the four bankruptcy judges

16

who sit in Newark. Instead, however, the Debtor's case was assigned to Judge Kaplan, who sits in Trenton.

It is not possible from public sources to know why this case was assigned to Judge Kaplan, and I impute no impropriety, but the assignment fits the pattern of large New Jersey bankruptcy cases being assigned to Judge Kaplan at a much higher rate than to other New Jersey bankruptcy judges.

## B. The Disparity in Case Assignments in Large Chapter 11s Among New Jersey Bankruptcy Judges

According to data from BankruptcyData.com, from 2018-present there have been 78 chapter 11 cases in which the debtor scheduled at least $10 million in liabilities that were filed in or transferred to the District of New Jersey.[12] If these cases were randomly distributed among nine judges, one would expect each judge to have had around 8-9 cases, or 11% of the large cases.

The actual distribution, however, looks quite different. Judge Kaplan was assigned 26% of the large cases. Distribution of filing vicinage does not explain the variation in assignments, as 65% of the chapter 11 cases

---

[12] The use of the $10 million threshold excludes subchapter V small business cases.

with over $10 million in liabilities that were assigned to Trenton-based judges went to Judge Kaplan.

The breakdown is starker for "large" cases, those with at least $100 million in liabilities scheduled. Judge Kaplan has been assigned 50% of the large cases filed in New Jersey since 2018 (and 80% of those assigned to Trenton vicinage judges), but only 9% of the smaller cases. The large cases were assigned to Judge Kaplan at a rate more than two standard deviations from the expected mean distribution. Figure 3 illustrates the disparity in case assignment among judges for regular and large cases.

**Figure 3. Large Chapter 11 Case Assignments in District of New Jersey, 2018-Present[13]**



The exact reasons for the disparity in case assignment are not clear. Judge Kaplan himself noted in a 2023 interview that case assignment for large cases is not random,[14] but the assignment methodology is opaque. Without transparency in the case assignment process, the disparity in assignments can lend itself to a perception of judge shopping, making manufactured venue hooks all the more concerning.

---

[13] Source: BankruptcyData.com.

[14] James Nani, *Judge Kaplan on NJ Bankruptcy Court Getting Its Due: Q&A*, BLOOMBERGLAW, Aug. 21, 2023.

## V.    Mandamus Should Be Granted More Freely in Bankruptcy Cases Because of Unique Obstacles to Bankruptcy Appeals

The writ of mandamus is an extraordinary remedy. For the writ to issue, the petition must show "(1) a clear and indisputable abuse of discretion or error of law, (2) a lack of an alternate avenue for adequate relief, and (3) a likelihood of irreparable injury." *In re Abbott Lab'ys*, 96 F.4th 371, 379 (3d Cir. 2024).

In bankruptcy cases, the nature of the bankruptcy appeals implicates the second prong of the *Abbott Laboratories* test. The structure of the bankruptcy appellate process and certain doctrinal issues prevent many critical issues in bankruptcy cases from ever getting any regular appellate review on the merits. Mandamus petitions often present the sole opportunity for any appellate review of bankruptcy court decisions, so the standard of review for mandamus petitions from the bankruptcy court should not be as stringent as with a regular mandamus petition concerning a district court judgment.

Bankruptcy cases differ from regular civil litigation in that they have an extra level of appellate review that results in greater delay before appeals are exhausted: cases are appealed from the bankruptcy court to

20

the district court and only then to this Court. The additional delay from the extra level of review increases the time cost of the appellate process, which can dissuade parties from taking appeals in the first place.[15]

Additionally, a trio of doctrinal obstacles blocks many bankruptcy appeals. First, the Bankruptcy Code limits appellate remedies for challenges to financing and asset sale transactions, which cannot generally be reversed on appeal. 11 U.S.C. § 363(m), 364(e). As a result, there is scant incentive to appeal once these transactions have "closed," as they generally do shortly after bankruptcy court approval.

Second, an appeal cannot generally be taken unless it is of a "final judgments, orders, [or] decrees." 28 U.S.C. § 158(a). As I have previously written, however:

> It is unclear how … "final order" jurisprudence applies to things like denial of a motion to dismiss a case for bad faith filing (because the case can always be subsequently dismissed), [or to] *denial of a venue transfer motion (because venue can still be subsequently transferred)*....[16]

To the extent there is no final order, no appeal can be taken as of right.

---

[15] Adam J. Levitin, Purdue*'s Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079, 1123-25 (2022).

[16] *Id.* at 1126 (emphasis added).

Finally, the doctrine of equitable mootness restricts appellate review of plan confirmation orders in order to protect reliance interests. The equitable mootness doctrine has been embraced by this Court. *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc).

The final order doctrine and the equitable mootness doctrine combine to forestall many bankruptcy appeals: the dispute cannot be appealed until there is a final order, which might only be after plan confirmation, and then, by the time the appeal is actually heard, the plan has gone effective, so the equitable mootness precludes a remedy.

The result of this is that many issues in bankruptcy cases, including challenges to venue, are "capable of repetition, yet evading review." Mandamus be granted more freely vis-à-vis bankruptcy courts because of the particular obstacles to regular appellate review.

## CONCLUSION

The writ of mandamus should issue.

Respectfully submitted,

Dated: Mar. 23, 2026

Adam J. Levitin
  *Counsel of Record*
600 New Jersey Ave., NW
Washington, DC 20001
AJL53@georgetown.edu
202-662-9234

22

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I certify that:

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,858 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac v.16.78.3 in 14-point Century Schoolbook font.

Dated: March 23, 2026                                    /s/ Adam J. Levitin

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2026, I caused the foregoing to be filed with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. For participants in the case who are registered CM/ECF users, service will be accomplished through the CM/ECF system.

Dated: March 23, 2026                    /s/ Adam J. Levitin

## CERTIFICATE OF ADMISSION

I hereby certify pursuant to Local Rule 28.3(d) that I am admitted to practice before the bar of the United States Court of Appeals for the Third Circuit.

Dated: March 23, 2026                    /s/ Adam J. Levitin

24